Good morning, Your Honors. May it please the Court, I'm Scott Bratton on behalf of the Petitioner Yang Zhang. I'd like to reserve two minutes for rebuttal, if I could. Please watch the clock. Thank you. The Petitioner in this case contends that the substantial evidence does not support the Board's decision denying relief. Although my brief addresses several issues today, I want to focus on the protection under the Convention Against Torture claim, and we would submit that the evidence compels the conclusion that Petitioner would be tortured if he returns to China. As set forth in our brief, the Petitioner contends the adverse credibility findings not supported by substantial evidence, and that's set forth at length. However, even in the absence of credible testimony, Petitioner has argued throughout proceedings that he's entitled to protection under the Convention Against Torture based on the independent evidence that's contained in the record. This includes the background evidence submitted in support of the 589. As this Court found in Nauru, country conditions alone can play a decisive role in granting cat relief. Additionally, Petitioner's fiancée. The IJ thought that your client did not fall within the list set forth in the country report, political and religious dissidents, lawyers, members of the minority Uyghur ethnic group, practitioners of the band Falun Gong, spiritual movement. And so he didn't fall within those categories of individuals facing heightened threats of torture. Doesn't that support the IJ's determination? Well, I think in looking at the record, the record, there's a number of documents related to torture, and torture occurs to criminal detainees regardless of their background. Obviously, there's a heightened risk of torture for certain people. And it references the Human Rights Watch report, which says torture is particularly common and severe in murder cases, triad-related crimes and corruption cases, and also didn't find that Zhang was accused of that type of crime either. So the IJ says, look, there may be a common use of torture in Chinese prisons, but it's aimed at these categories that your client doesn't fall into, and therefore there's not – he hasn't shown a particularized risk of torture if he returns to China. Well, and I think with respect to that and looking at all of the background evidence, it talks about different classifications of people. The Human Rights Report specifically talks about ordinary criminals being subject to torture in prison, criminal defendants. And torture is used to extract confessions, and it's used in all – throughout the criminal justice system in China. It's not just simply related to a certain class of individuals. Certainly some, there's a heightened risk. But in this case, I would submit there is a heightened risk. We have an individual who the Chinese government placed on Interpol, and he was on the public Interpol for a while. There's an arrest warrant. Additionally, in looking at the evidence, the independent evidence submitted, they've harmed and harassed his mother and ex-wife. They contacted a Chinese national in the United States to assist in the investigation of him. They harmed a former coworker. Do you know about any of that except through his testimony? Yes, through the statements that were submitted to the court. Well, except for the hearsay statements. And additionally, the – It didn't give much weight to, like, the letters that he submitted. I said they were hearsay and there were inconsistencies, and so it didn't give much weight to them. Well, with respect to that, the board relied on the Gu case out of this court to give the letters limited probative value. However, in that case, the issue in that case was there was an individual in China who told the respondent in removal proceedings that the Chinese government was looking for him. Here we actually have statements from people themselves saying this is what's happening. They're harming me. They're contacting me and asking me these things. We also have the testimony that was – I know with the letters from Yun – I don't know if I'm pronouncing her name right, but the I.J. specifically said, well, in 2015, she says everything about this business was lawful. In 2016, she says I was arrested, detained, and tortured. And the inconsistency between those letters caused the I.J. to say I don't find them very persuasive. And one of the issues that we have with the agency in this case in examining this is we have a detained respondent who's lucky to be able to get any documentation in support of this case with people who are obviously reluctant to do so in light of the fact that the record shows that the Chinese government monitors communications and things like that. The first letter said what it said. We specifically asked for a second letter to address further information regarding what had happened to her, including the issue with the criminal prosecution, and we got the second letter that was submitted. We additionally have the ex-wife's letters. There's two letters that were submitted by her. And we have his mother's statements as well about them harassing her, wanting the petitioner to come back to China. So we have that. We also have his fiancée's testimony, which was largely overlooked, and his fiancée was in contact with his mother in China and learned a lot of information about how the government was looking for her fiancée or the petitioner. So that doesn't really get to the torture issue, which you were focusing on, as to why he was at a particularized risk. It's more likely than not that he individually would be tortured on his return to China. Well, in this particular case, I believe that it does because you have a person the Chinese government defines as an overseas fugitive. I think the background evidence illustrates that where the Chinese government believes a case is important or high profile, and I don't even think you need to get to the high profile. They clearly believe this is an important case, and someone with an important case. Just because they've got an arrest warrant out on them? That, by definition, means an important case? No, not just because of the arrest warrant. We have the arrest warrant. We have the Interpol notice. But they've gone to great lengths. The Chinese government, according to the evidence in the record. I'm not sure the lengths are all that great. If you've got somebody who you're trying to arrest, the Interpol notice isn't exceptional. But in the end, you're going to have to point to something in the country reports against a tough standard, more likely than not tortured, and so compelling that the finder, in fact, couldn't have concluded to the contrary. So what's the best evidence you can point us to, country condition report or anything else, that suggests the risk is that great? Well, the background evidence shows that, and this is set forth in the brief, that torture is systemic and embedded in the criminal justice system. According to the Human Rights Watch, torture is nationwide, common, serious, and entrenched. And as I stated, this is a more significant case than normal. They have taken the step of contacting someone in the United States, a Chinese national in the United States, to try to assist. They've harmed his ex-wife in this particular case, according to her letters. They've frequently contacted his mother, multiple times, every 10 to 15 days for a while, trying to get her to get him to come back to the country. All of this evidence is in the record. This isn't a normal case for the Chinese government, for whatever reason. Maybe it's because the mayor was involved in the business dealings. But it is not being considered a normal case. They knew he was in detention, according to the record, but still continued to contact the family to try to get him to come back to China. And when examining this, along with all the background evidence in the case, talking about the pervasiveness of torture within the criminal justice system in order to obtain confessions, this is a reason we don't have an extradition treaty with China, because of the torture used in confessions, because of the 99% conviction rate that exists within the Chinese criminal justice system. And we would submit, in looking at the record in its totality that the petitioner has established, it's more likely than not that he would be tortured if he returns to China. Do you want to save some time for rebuttal? I would. Thank you. We'll hear from the government. May it please the Court, Victor Lawrence on behalf of the Attorney General. This Court should deny this petition for review, as substantial evidence supports the agency's adverse credibility determination, which renders Mr. Sheng ineligible for asylum and withholding of removal. In addition, that same adverse credibility determination also infects his claim for protection under the Convention Against Torture. But even when we set aside the adverse credibility determination and look at the torture claim on its merits, the agency relied on substantial evidence in the record to conclude that Mr. Sheng did not demonstrate a clear probability of experiencing mistreatment, rising to the level of torture if he's imprisoned and returned to China. In listening to my petitioner's argument, I find that what he's doing is conflating the idea that China has an interest in this particular individual with the idea that he would be tortured, and the two don't match. Yes, they have an interest in him. They do have an Interpol red notice on file to seek his extradition. They do believe that he stole $10 million from the public or defrauded the public out of $10 million. So they have a clear interest in him. But that doesn't equate to the fact that he's going to be tortured if he returns to China. The country report doesn't say every criminal in China is tortured, but it does come fairly close to suggesting that. Why isn't that enough? Well, Your Honor, I think the other part of the human rights report that you pointed out earlier, where it says that actual torture is inflicted on people of high-profile nature who committed crimes of murder and political dissidents, lawyers, activists, et cetera, are the ones— $10 million from the public funds? That wouldn't qualify? That seems pretty high-profile. It seems the kind of thing the government would be interested in. But it's also speculation, Your Honor. And it's the petitioner's burden here to prove that there's a clear probability. You say speculation. I mean, is it speculative that that's what he's accused of? It may be speculative whether he did it, but the concern expressed is that in China the system is set up to extract confessions. So if they think he did it, whether he had done it or not, that's enough to raise at least a serious specter of torture. No, but when I was responding to your question and said that there's speculation here, what we're talking about is speculation that he will actually suffer mistreatment, rising to the level of torture. But I think Judge Clifton's point is that there's no speculation about what he's being accused of. And when you look at what he's being accused of and match that with the country condition reports, why isn't petitioner's counsel correct that that compels a finding that torture is more likely than not? Because the fact that there's a generalized risk in China, generally about people being forced into confessions and mistreatment of prisoners, does not equate to a particularized threat against Mr. Shang that he, indeed, will suffer torture if he returns to China. So when we just point to generalized evidence, that would really apply to any person going back to China who committed any sort of crime. But we're coming back to the question that Judge Okuda posed, which is that some categories are identified in some of these country reports as being of particular risk. Now, I'll acknowledge that the reports don't use the language of immigration law, so they don't speak in terms of risk more likely than not, but it does leave the impression that at least certain categories, and this person may not be perceived as an enemy of the state, as in someone who's trying to overthrow the government, but he's an enemy of the state in terms of somebody who's believed or alleged to have stolen $10 million of public funds. Why wouldn't that push this person into the category of those at greater risk? Well, there's no evidence in the record to support that, though, Your Honor. Support what? To support the idea that he's at greater risk because he committed this particular crime. There is evidence in the record to support the idea that if he committed a crime such as murder, if he was a political dissident, or if he was an activist or a lawyer, there is evidence in the record to support that idea that he would suffer from torture. But there's nothing that says in the record that there's a particularized threat just based on the country conditions evidence that because he committed this particular crime that he has a clear probability that if he goes back to China he's going to be tortured. There's nothing in the record to support that. Well, there are at least some references, and I'll have to go back and gather them again, I guess, but about China's campaign against public corruption and people who may have connived with public officials. And if you've got somebody who gets access to and figures out a way to squirrel away $10 million of public fund, the prospect of that being identified as a target in this anti-corruption campaign isn't a hard inference. Well, that's where we're conflating two things that don't deserve to be conflated, in my view, Your Honor. The idea that China is interested in people like this individual who defrauded people out of millions of dollars. That's one thing. We agree that there's evidence in the record to support the idea that China is interested in them. And should be, if it happens to be true. Sure, any country would be interested in ISIS in the same way. So we agree that there's evidence in the record to support that particular point, that they are interested in him. But there's nothing in the record, and this is why the board's decision is supported by Sanford Osment, because they point to the fact that there's nothing in the record to support the fact that there's a particularized threat against this individual for the crime that he committed. Now, you know, the petitioner had ample time during the course of his proceedings to develop as much evidence as he possibly could. And Your Honor pointed out that, Judge Akuta pointed out that there were some letters that were submitted, but the immigration judge reasonably believed that they were relied on hearsay and there were inconsistencies within those letters. And those letters did nothing to establish the idea that there was a clear probability that Mr. And that's why this court should deny this petition for review. It's a it's a it's a burden issue. He had Mr. Chang had the burden to show that he was eligible for protection under the Convention Against Torture. To do so, he has to show that there is a clear probability. It's more likely than not that if he returns to China, that he would be tortured. He relied on a lot of record evidence to try to make that case. But when we review the record evidence, it doesn't quite get there. There's there's an idea that some people suffer torture for some types of crimes, as Your Honor pointed out. But there's nothing in the record to support the idea that an individual such as Mr. Chang, based on the country conditions, evidence alone is or or the additional letters that he submitted, is going to show that it's more probable than not that he that he's going to suffer torture. Then when you combine that with the adverse credibility determination as well, it's even more evidence in the in the agency's favor, if you will, or to show that the agency relied on substantial evidence to determine that that he did not merit protection under the Convention Against Torture. If if Your Honor's wish, I could go into the adverse credibility determination briefly. Which which is there's an overall inconsistency in Mr. Chang's claim. On the one hand, he's claiming that he had this business investment business where he was raising money and it was legal and it was endorsed by the country of China, that they were actually helping him set up the company at the government's request. This is at pages 671 and 676. And he claims that his business was absolutely illegal. This is again at page 686. But on the other hand, we have the Interpol red notice. We have the idea that he's has an arrest warrant from the city of Monshan. So when the immigration judge looked at this and he's saying, you know, this guy is telling me that everything's perfectly legal on the up and up and that the Chinese government endorsed it. And on the other hand, they're seeking his extradition for defrauding for him, defrauding people out of ten million dollars as a result of the same company that he said was legal. They determined that that was a reasonable inconsistency. And they asked him questions about it to to give him a chance to explain why that was not an inconsistency. And here's where Mr. Chang went on a series of shifting explanations. That's captured in in our brief at page 35 and also in the record between pages 655 and 725. He claims several different things. First, that the Chinese government wanted him to confess to subverting the communist regime. He claimed that he was being controlled by an American organization. He claimed that the house arrest based on his religious persecution was a front for some for some other activity that he was doing at his home. And he also claimed that he was being retaliated by this particular mayor with respect to the arrest warrant because the mayor didn't didn't profit, I guess, enough from his business. So he goes on this series of shifting explanations. And as this court is aware from its opinion in Zamenhof versus Holder and other cases, there's no requirement for the immigration judge to accept a particular person's explanations. And in this case, there just wasn't a ring of truth to all the explanations. We had a guy who comes in first with an asylum claim claiming a religious persecution that starts not going well for him. As far as the evidence he's presenting, rising to the level of torture, etc. But then then he shifts and says, oh, it's about my business. And before that, by the way, he tried to adjust his status. And the immigration judge is taking all this in and seeing how he's shifting every every few minutes as his claim is not developing the way he wanted and reasonably concluded that there was not a ring of truth in his testimony. And therefore, the adverse credibility determination is supported by substantial evidence. And we urge the court to deny this petition for review as the petitioner has not shown a clear probability that he will be tortured if he returns to China. Thank you very much. Thank you. You have some time for rebuttal. Thank you. And I would submit that this is a serious case in light of the actions taken by the Chinese government. It is similar to a corruption type case, as the background evidence shows. And we cited to that background evidence at pages 55 to 59 of the brief. He does face a particularized risk of torture. This isn't a general risk of torture in this case. And that's based on not just the Interpol notice and the arrest warrant, but all of the other things. They've gone to the lengths to harm individuals that have been associated with them, such as his ex-wife. They've contacted someone in the United States. And I believe that substantial evidence does not support the board's decision denying relief under the Convention Against Torture. Just briefly to respond to the issues with respect to credibility, the petitioner did submit that he thought the business was legitimate at the start.  But be it because the law changed or the issue with Mayor Zhu, the Chinese government started coming after him. We would submit, as we stated in our brief, this is not an inconsistency. When he was discussing reasons why he believes the Chinese government was after him, he wasn't there. He was basing it on information he was learning from others. And his mother and ex-wife told him that there were issues with respect to religion. They were looking into the business. He was just addressing the reasons why he thought. And I would submit that, as we stated in our brief, that those aren't shifting explanations. Those are the reasons why he believed that they were after him. And there could be multiple reasons. And he wasn't 100 percent positive why. But we would submit, as stated in our brief, that the adverse credibility finding also isn't supported by substantial evidence and would ask that the petition for review be granted. Thank you. Thank you. We thank both sides for their argument. The case of Yang Sheng v. William Barr is submitted.
judges: Clifton, Ikuta, Bennett